UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLCELLS, LLC,<br><br>   Plaintiff,<br><br>  v.<br><br>BIOIVT, LLC, et al.,<br><br>   Defendants. | Case No. 20-cv-06044-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 42 |

Plaintiff AllCells, LLC ("AllCells") sued its former employee, Defendant James Lee, for breach of a settlement agreement under which Mr. Lee agreed, for a period of five years, not to receive from any direct competitor of AllCells (1) an annual salary of more than $250,000.00 or (2) any equity compensation. AllCells also sued Defendant BioIVT, LLC ("BioIVT"), Mr. Lee's current employer, and Defendant Kevin King, BioIVT's Chief Operating Officer (CEO), for intentional interference with contractual relations. Finally, AllCells sued all Defendants for unlawful practices under California's Unfair Competition Law (UCL), Cal Bus & Prof. Code § 17200.

Pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a). *See* Docket No. 42 ("MSJ"). For the following reasons, the Court **GRANTS** Defendants' motion for summary judgment on all remaining claims.

## I.   BACKGROUND

A.   Factual Background

AllCells is a California company providing blood products (cells) for use in research and development. *See* Docket No. 13 (FAC) ¶ 13. Mr. Lee worked for AllCells from the year 2000 to

1   April 5, 2016, rising through the ranks to become the company's Associate Director of Technical
2   Support and Custom Projects.  *Id.* ¶¶ 14–15; *see also* Docket No. 42-2 (Decl. of James Lee in
3   Supp. of Defs.' Mot. for Summ. J. ("Lee Decl.")) ¶ 2.  After leaving AllCells, Mr. Lee partnered
4   with Mr. Jack Zhai to form Cepheus, a company that directly competed with AllCells and
5   allegedly misappropriated AllCells' trade secrets.  *Id.* ¶ 16–17.

6       On June 5, 2017, AllCells and Mr. Lee executed a confidential settlement agreement (the
7   "Settlement Agreement") which resolved a federal trade secrets misappropriation lawsuit AllCells
8   brought against Mr. Lee, Mr. Zhai, and Cepheus, *AllCells, LLC v. Zhai, et al.*, No. 3:16-07323-
9   EMC (N.D. Cal. filed Dec. 23, 2016) (the "*Zhai* Action").  *Id.* ¶ 20.  Importantly, the Settlement
10  Agreement specifies that, for a period of five years starting on April 17, 2017, Mr. Lee will not
11  receive from any direct competitor of AllCells (1) an annual salary of more than $250,000, or (2)
12  any equity compensation.  *Id.* ¶¶ 20–21; *see also* Lee Decl. ¶ 3.  Mr. Lee submitted a declaration
13  in support of Defendants' motion for summary judgment stating that, since April 17, 2017, he has
14  not owned, directly or indirectly, any equity interest in any company that directly competes with
15  AllCells or received compensation exceeding $250,000 from any employer.  *See* Lee Decl. ¶ 4.

16      In July 2017, Mr. Lee took a job with Physicians Plasma Alliance, Inc. (PPA), AllCells's
17  direct competitor.  FAC ¶ 22' *see also* Lee Decl. ¶ 5.  Mr. Lee declared that he did not sign any
18  employment contract for his work with PPA, was never paid more than $250,000 per year while
19  working for PPA, and "at no point in time . . . owned any equity in PPA, either directly or
20  indirectly through PPA's shareholders, including BD Investors Group LLC."  *Id.* ¶ 5, 6.  Mr. Lee
21  also declared that "at no point in time ha[s he] ever entered into any side letter, shareholder
22  agreement, or any other type of document or agreement with any person or entity to hide any
23  ownership shares in PPA or shares or membership interests in BD Investors Group LLC."  *Id.*  Mr.
24  Lee's tax returns confirm that his earnings from PPA totaled $42,499,99 in 2017, $89,999.98 in
25  2018, and $143,138.42 in 2019.  *Id.*, Exs. A–C.

26      Mr. Lee's statements are also corroborated by a declaration from Mr. King, who also stated
27  that Mr. Lee was never paid more than $250,000 by PPA, nor was he "provided any equity in PPA
28  or promised any equity in PPA under any circumstances."  *See* Docket No. 42-2 (Decl. of Kevin

United States District Court
Northern District of California

King in Supp. of Defs.' Mot. for Summ. J. ("King Decl.")) ¶¶ 4–5. In fact, Mr. King and his co-founder, Dr. Bruce Boggs, declared that the only shareholders of PPA were themselves (Mr. King owned 30% and Mr. Boggs owned 10%) and investor BD Investors Group LLC ("BD Investors"), which owned 60%. *See* King Decl., ¶ 7; Docket No. 42-7 (Decl. of Bruce D. Boggs, M.D. in Supp. of Defs.' Mot. for Summ. J. ("Boggs Decl.")) ¶ 4. Mr. King also attached the August 5, 2019 Stock Purchase Agreement (SPA) to his declaration, whereby BioIVT acquired all outstanding capital stock of PPA, and wherein each PPA shareholder—Mr. King, Dr. Boggs, and BD Investors—represented and warranted that they collectively owned 100% of the issued and outstanding capital stock ("Shares") of PPA. *See* King Decl., ¶¶ 9–10, Ex. E at §§ 2.03(b) (the Shares held by Mr. King, Dr. Boggs, and BD Investors "constitute 100% of the total issued and outstanding ownership in [PPA]."). Jeffrey Gatz, the Chief Executive Officer of BioIVT, who oversaw BioIVT's acquisition of PPA, also declared that "BioIVT acquired all outstanding PPA stock from Mr. Kevin King, Mr. Bruce Boggs, and BD Investors." Docket No. 42-3 (Decl. of Jeffrey Gatz in Supp. of Defs.' Mot. for Summ J. ("Gatz Decl.")) ¶ 3.

There is also strong evidence that Mr. Lee did not indirectly own PPA stock through BD Investors. First, Mr. Lee outright denies this in his sworn declaration. *See* Lee Decl. ¶ 6. Second, each of the PPA shareholders warranted as follows in the SPA:

> There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to any interests in [PPA] or obligating any Seller [Mr. King, Dr. Boggs, or BD Investors] or [PPA] to issue or sell any interests (including the Shares), or any other interest in [PPA].

King Decl., Ex. E at 2.03(c). In other words, the SPA states that none of the PPA stock acquired by BioIVT was purchased from Mr. Lee. Third, Ray Soly and Darren Lowenthal declared that they each owned 50% of BD Investors at the time that BioIVT acquired PPA. *See* Docket No. 42-5 (Decl. of Ray Soly in Supp. of Defs.' Mot. for Summ. J. ("Soly Decl.")) ¶ 2; Docket No. 42-6 (Decl. of Darren Lowenthal in Supp. of Defs.' Mot. for Summ. J. ("Lowenthal Decl.")) ¶ 2. Finally, BD Investors's tax returns and schedules from 2016 through 2019 confirm that Messrs. Soly and Lowenthal where the sole owners of the company. *See* Soly Decl. ¶ 3; Lowenthal Decl.,

3

¶¶ 3, 6, Exs. A–D.

On August 5, 2019, BioIVT acquired all outstanding capital stock of PPA in exchange for cash, *see* Gatz Decl. ¶ 3; King Decl. ¶¶ 9–10, Ex. E, and Mr. Lee began working for BioIVT on October 1, 2019, *see* Lee Decl., ¶ 17, Ex. E. Prior to entering into this agreement, Mr. Lee advised Mr. Gatz of the restrictions contained in the *Zhai* Action's Settlement Agreement. Lee Decl. ¶ 17; Gatz Decl. ¶ 4. As a result, BioIVT capped Mr. Lee's compensation at $250,000, consisting of $150,000 in base salary and $100,000 in annual variable compensation. *See* Lee Decl. ¶ 17; Gatz Decl. ¶ 4. Mr. Lee also declares that he "[has] no equity interest in BioIVT or any of its affiliated companies." Lee Decl. ¶ 17; *see also* Gatz Decl. ¶ 4, 5–7, 9–10. Mr. Gatz confirms this, also stating that neither BioIVT nor any of its parent or affiliated companies "ever entered into any side letter, shareholder agreement, or any other type of document or agreement to conceal membership interests or shares owned by Mr. Lee because he owns no membership interests or shares in any of these entities." *Id.* at ¶ 7.

At the hearing on Defendants' motion, AllCells argued that summary judgment was inappropriate at this time because there was insufficient evidence, pursuant to Federal Rule of Civil Procedure 56(d), that Mr. Lee's salary increase in 2019 was not the result of BioIVT paying Mr. Lee under the table for PPA stock that Mr. King was secretly holding for him. In an abundance of caution, the Court instructed Defendants to file a declaration explaining further the reasons for Mr. Lee's salary increase in 2019, and whether that increase had anything to do with BioIVT's acquisition by PPA. *See* Docket No. 47 (Apr. 8, 2021 Minute Entry). In response, Mr. King submitted a second declaration explaining that BioIVT increased Mr. Lee's compensation in 2019 "because of (1) his sales achievements for PPA and (2) PPA's financial ability to increase Mr. Lee's wages as a result of being acquired by BioIVT." *See* Docket No. 49 (Decl. of Kevin King in Supp. of Defs.' Mot. for Summ. J. ("Second King Decl.")) ¶ 5. More specifically, Mr. King attached a printout of PPA's payroll journal for Mr. Lee in 2019, showing that his base salary went from $85,000 per year ($3,369.23 before taxes every two weeks) at the start of 2019, to $110,000 per year ($4,230.77 every two weeks) starting on April 26, 2019, as a result of his "strong sales and work performance." *Id.* ¶¶ 6, Ex. F. Mr. Lee's salary increased again on

4

1    October 11, 2019, shortly after BioIVT's acquisition of PPA in August 2019, to $150,000 per year
2    ($5,769.23 every two weeks) and remained that way through the end of 2019. *Id.* ¶¶ 8, Exs. L &
3    M.  These salary increases, according to Mr. King, were the result of "Mr. Lee's strong sales and
4    work performance." *Id.* ¶ 6.  Mr. King also attached five pay statements for June 7, June 21, July
5    3, July 19, and July 30, 2019, all before the BioIVT acquisition, showing that Mr. Lee earned five
6    sales commission payments ranging from $2,500 to $10,000 (for a total of $30,000), which Mr.
7    King also contends "had nothing to do with the sale of any PPA stock held by anyone, and instead
8    were commissions Mr. Lee rightfully earned for his sales." *Id.* ¶ 7, Exs. G–K.

9           AllCells also argued at the hearing on the instant motion that there was insufficient
10   evidence that Mr. Lee had not received equity or compensation in excess of $250,000 from
11   BioIVT in 2020 or 2021 and that notwithstanding the plethora of declarations and documentary
12   evidence produced by Defendants, AllCells was entitled to additional discovery under Rule 56(d).
13   Again, in an abundance of caution, the Court instructed Defendants to prepare, file, and
14   authenticate any employment agreement between BioIVT and Mr. Lee for those years. *See* Apr.
15   8, 2021 Minute Entry.  In response, Defendants submitted a declaration from Bryan McDowl,
16   BioIVT's Associate Director of Human Resources, who declared that Mr. Lee has not been paid
17   more than $250,000 while working at BioIVT. *See* Docket No. 50 (Decl. of Bryan McDowl in
18   Supp. of Defs.' Mot. for Summ. J. ("McDowl Decl.")) ¶ 3.  Mr. McDowl also explained that, in
19   lieu of signing a new employment contract with BioIVT for 2020, Mr. Lee reaffirmed the terms of
20   his 2019 employment agreement and executed a "2020 BioIVT Annual Variable Compensation
21   Plan" specifying that he would earn a base salary of $150,000 and additional variable
22   compensation, in the form of sales commissions and bonuses. *Id.* ¶ 4, Ex. A &B.  As for 2021,
23   Mr. Lee accepted a new position as Lab Director for BioIVT, which is memorialized in an offer
24   letter signed by Mr. Lee stipulating that his base salary will remain $150,000 per year but that his
25   variable compensation will slightly change. *Id.* ¶ 5, Ex. C.  Importantly, the offer letter for 2021
26   also explicitly states that "in no event shall [Mr. Lee's] annual total compensation exceed
27   $250,000." *Id.*
28

B.  Procedural Background

AllCells filed the instant action on August 27, 2020. *See* Docket No. 1 ("Compl."). On September 21, 2020, Defendants filed a motion to dismiss the complaint, *see* Docket No. 11, prompting AllCells to amend the complaint on October 2, 2020, *see* Docket Nos. 1, 13.

On October 16, 2020, Defendants filed a second motion to dismiss or for a more definite statement. *See* Docket No. 15 ("MTD"). The Court held two hearings on Defendants motion to dismiss. First, on December 18, 2020, the Court deferred ruling on the motion to dismiss and instructed Defendants to provide AllCells with enough information to show that Mr. Lee did not own any stock in PPA in an attempt to resolve this action without having to rule on Defendants' motion. *See* Docket No. 34 (Dec. 18, 2020 Min. Order).[1] Second, on January 28, 2021, the Court dismissed AllCells's claim under the unlawful prong of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code 17200, but again deferred ruling on the motion to dismiss AllCells's other claims. *See* Docket No. 39 (Jan. 28, 2021 Min. Order). This time, however, the Court warned the parties that if they were unable to resolve their dispute the Court would construe Defendants' motion to dismiss as a motion for summary judgment, to be heard on April 8, 2021.

On March 4, 2021, pursuant to the Court's instructions at the January 28 hearing, Defendants filed their pending motion for summary judgment. *See* MSJ.

## II.  MOTION FOR SUMMARY JUDGMENT

A.  Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence

---

[1] The Court also denied Defendants' motion for sanctions (Docket No. 18) at the December 18 hearing. *Id.*

must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255. Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Under Rule 56(d), when 'a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.'" *Atay v. Cty. of Maui*, 842 F.3d 688, 698 (9th Cir. 2016) (quoting Fed. R. Civ. P. 56(d)). The Ninth Circuit has specifically held, however, that "[t]he burden is on the party seeking a Rule 56(d) continuance 'to proffer sufficient facts to show *that the evidence sought exists*, and that it would prevent summary judgment.'" *Id.* (quoting *Chance v. Pac–Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001)). Therefore, to obtain a continuance under Rule 56(d), the non-moving party must, at a minimum, "identify by affidavit the *specific facts* that further discovery would reveal, and explain why those facts would preclude summary judgment." *Henry v. Adventist Health Castle Med. Ctr.*, 970 F.3d 1126, 1133 (9th Cir. 2020) (emphasis added) (quoting *SEC v. Stein*, 906 F.3d 823, 833 (9th Cir. 2018), *cert. denied*, ––– U.S. –––, 140 S. Ct. 245 (2019)); *see also Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018) ("A party seeking to delay summary judgment for further discovery must state 'what other *specific evidence* it hopes to discover [and] the relevance of that evidence to its claims.'" (emphasis added) (quoting *Program Eng'g, Inc. v. Triangle Publ'ns., Inc.*, 634 F.2d 1188, 1194 (9th Cir. 1980))). In particular, "[t]he requesting party must show [that]: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Fam. Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008).

B.  <u>Breach of Contract Against Mr. Lee</u>

Under California law, "the elements of a cause of action for breach of contract are (1) the

7

1   existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's
2   breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 250
3   P.3d 1115, 1121 (Cal. 2011) (citing *Reichert v. Gen. Ins. Co.*, 442 P.3d 321, 377 (Cal. 1968)).
4   Defendants argue that there was no breach of the Settlement Agreement because there is no
5   genuine factual dispute that Mr. Lee has not been (1) paid more than $250,000.00 per year or (2)
6   received any equity compensation from any direct competitor of AllCells. *See* MSJ at 10–12.

7         There is overwhelming unrebutted evidence showing Mr. Lee did not receive a salary over
8   $250,000 from or equity in PPA. There is sworn unequivocal testimony from Mr. Lee, Mr. King,
9   Mr. Gatz, Mr. Soly, and Mr. Lowenthal, that Mr. Lee does not own, directly or indirectly, any
10  equity in PPA, BioIVT, or any other direct competitor of AllCells. *See* Lee Decl. ¶¶ 3–4, 6; King
11  Decl. ¶¶ 4, 7-8; Gatz Decl. ¶¶ 3–7, 9; Soly Decl. ¶¶ 3–4; Lowenthal ¶¶ 3–4. All this testimony is
12  also supported by numerous documents, including Mr. Lee's W-2 Forms, tax returns, and pay
13  records, *see* Lee Decl., Exs. A–C; Second King Decl., Exs. F–M, BD Investors's tax records, *see*
14  Lowenthal Decl., Exs. A–D, and the 2019 SPA, *see* King Decl., Ex. E. Indeed, for there to be a
15  genuine factual dispute as to whether Mr. Lee received equity in PPA or BioIVT, the trier of fact
16  would have to conclude, based on no evidence whatsoever, that Messrs. Lee, King, Gatz, Soly,
17  and Lowenthal all committed perjury, and that numerous documents, including tax documents
18  filed with the Internal Revenue Service (IRS), were either fraudulent or contained entirely
19  fraudulent information. Therefore, there is no genuine dispute of material fact because no
20  reasonable trier of fact could ignore all this testimony and evidence in favor of AllCells's entirely
21  unsupported and fantastical speculation that Mr. Lee's salary increase is likely derived from a
22  "secret" sale of PPA shares. It would require a finding that five persons conspired to commit
23  perjury and fraud. AllCells presents no evidence supporting such a fantastic proposition.

24        AllCells speculates that Mr. Lee's 59% increase in salary from 2018 to 2019 "likely"
25  derives from "Mr. Lee's proceeds from the sales of his secret PPA shares pursuant to the BioIVT
26  acquisition of PPA in 2019." Opp'n at 1. But there are many perfectly innocuous reasons why
27  someone's salary might increase from one year to another, not to mention that Mr. King provided
28  a perfectly reasonable explanation for the salary bump: "Mr. Lee's wages increased in 2019

because of his sales achievements and PPA's financial ability to increase Mr. Lee's wages as a result of being acquired by BioIVT." King. Decl. ¶ 5; Second King Decl. ¶ 5.

Other than the increase in Mr. Lee's salary, AllCells speculates that Mr. Lee was "secretly" paid for selling PPA shares because he signed an employment agreement with BioIVT in 2019 but his tax returns show that PPA paid his salary that year. Opp'n at 9–13. But Defendants correctly point out that PPA is still an active California corporation operating as a subsidiary of BioIVT. *See* Docket No. 18-8 (Decl. of Benjamin P. Smith in Supp. of Defs' Mot. for Rule 11 Sanctions, Ex. G (Cal. Secretary of State, Statement of Information)). Mr. Lee received a singular salary. The fact that it was paid by the subsidiary proves nothing. There is no genuine factual dispute as to whether Mr. Lee owned equity in PPA or BioIVT or was ever paid in excess of $250,000 by either company. *See Celotex*, 477 U.S. at 322–23 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

In response to the lack of any evidence countering the overwhelming evidence negating any claim of breach by Mr. Lee of the remuneration terms of the Settlement Agreement, AllCells has significantly changed its liability theory. First, AllCells argues that Mr. Lee owns equity in a direct competitor because his tax returns show that he is the sole owner of JL Bio, LLC ("JL Bio"), a California limited liability company that Mr. Lee registered in February 2018. According to AllCells, JL Bio is a "direct competitor" because its Schedule C description states its "principal business" is "providing human primary cells," which is also AllCells's principal business.

Mr. Lee's ownership of JL Bio is insufficient to constitute a breach of the Settlement Agreement, however, because there is no evidence that AllCells and JL Bio are "direct competitors" in any real sense, as required by the Settlement Agreement. *See* Docket No. 44-1 (Decl. of Jay Tong in Supp. of Pl. AllCells, LLC's Opp'n to Defs' [] Mot. for Summ. J. ("Tong Decl.")) ¶ 4 ("The Settlement Agreement specifies that . . . if Lee works for a direct competitor to AllCells he may not receive more than $250,000 per year in salary and may not receive any equity in the company."). Indeed, there is no evidence—other than the company's Schedule C description—that JL Bio has actually sold human primary cells to anyone, let alone that AllCells lost costumers or sales to JL Bio. To the contrary, Mr. Lee declared that he formed JL Bio solely

9

"to receive [his] share of payments from the sale of [Cepheus's] inventory," which amounted to "$3,653 in 2018 and $19,175 in 2019." Lee Decl. ¶ 12. This testimony is corroborated by JL Bio's 2018 and 2019 tax returns, which show that the company's revenue indeed amounted to $3,653 and $19,175, respectively." *Id.* Ex. B–C. Mr. Lee also declared that "at no point in time has JL Bio LLC itself sold any product or otherwise competed with AllCells." Lee Decl. ¶¶ 12–13. Considering this evidence, the mere existence of JL Bio is not enough to create a genuine factual dispute as to whether Mr. Lee breached the Settlement Agreement. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party].").

AllCells argues that, even though there is no evidence in the record that AllCells competes with JL Bio, the Court should defer ruling on Defendants' motion for summary judgment under Rule 56(d) to allow AllCells to conduct discovery to find that evidence. But AllCells has "failed to 'identify by affidavit the *specific* facts that further discovery would reveal, and explain why those facts would preclude summary judgment.'" *Henry*, 970 F.3d at 1133 (emphasis added) (quoting *Stein*, 906 F.3d at 833). This is particularly problematic because AllCells, as a seller of cells itself, could easily not only identify for the Court what specific information it seeks, but also ask its clients or distributors directly—or through a subpoena—whether they have purchased any cells from JL Bio. In other words, information about JL Bio's business dealings in the market for human cells is presumably available to AllCells as a major player in that field. Yet AllCells failed to produce any evidence of actual competition from JL Bio. Further delaying ruling on Defendants summary judgment motion is not warranted under Rule 56(d) because AllCells has not told this Court "what other *specific evidence*" of JL Bio's competition with AllCells "it hopes to discover through further discovery," and it has failed to present any evidence suggesting discovery would be anything more than a fishing expedition. *Stevens*, 899 F.3d at 678 (quoting *Program Eng'g, Inc.*, 634 F.2d at 1194)).

Accordingly, the Court **GRANTS** summary judgment to Defendants on AllCells's breach of contract claim because there is no genuine factual dispute that Mr. Lee did not breach the Settlement Agreement.

C.     Intentional Interference with Contractual Relations (IICR) Against BioIVT and Mr. King

The Court also **GRANTS** summary judgment to Defendants on AllCells's claim for intentional interference with contractual relations because, as explained above, there is no genuine factual dispute that Mr. Lee breached the Settlement Agreement. *See Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 589–90 (Cal. 1990) (in bank) (under California law, the elements of a claim for intentional interference with contract include . . . "(4) *actual breach or disruption of the contractual relationship*" (emphasis added)).

### III.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment on all remaining claims.

This order disposes of Docket No. 42. The Clerk of the Court is instructed to enter Judgment and close the case.

**IT IS SO ORDERED**.

Dated: April 21, 2021

_____
EDWARD M. CHEN
United States District Judge